**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Miami Division)**

**Case No. 25-cv-23202-JB**

ZOHRA KHORASHI,

      Plaintiff,

v.

GADI BEER AND BETH GELLMAN BEER,

      Defendants.

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SANCTIONS**

Defendants, Gadi Beer and Beth Gellman Beer ("Defendants"), and their attorneys Kenneth G. Turkel and Jaclyn S. Clark, oppose Plaintiff Zohra Khorashi's Motion for Sanctions and to Disqualify Defendants' Counsel for Extrajudicial Conduct [DE 32] (the "Motion") through the undersigned attorneys who specially appear, consistent with LR 11.1(d)(1), for the limited purpose of independent defense of the Motion and to vindicate Defendants' right to seek sanctions for the Motion itself.

**INTRODUCTION**

On October 7, 2023, Hamas forces invaded Israel and killed, kidnapped, and raped civilians. In the wake of this aggression and criminal action, some people rooted for Hamas. In America, one is free to say the perpetrators of the Rwandan genocide were the good guys, that Stalin was a hero, and that Pol Pot had the right idea. So they certainly have the *right* to side with Hamas. But just as they have a right to side with Hamas, others have a right to be outraged and disgusted by those who would side with the perpetrators of such atrocities.

We have not chosen to permit offensive speech because we simply value offense.  We permit it because we value wide open and robust debate. This philosophical pillar holding up the First Amendment protects not just those who would rise in favor of rape and murder, but also those who oppose such an opinion.  Opposing such an opinion includes shining a light upon those who espouse those views so that we can all see the speaker and judge them.

That speaker has no right to smash a light that shines on them because they prefer to hide in the shadows. The plaintiff wishes to shroud herself in darkness while espousing hate speech. Justice Holmes wrote, "time has upset many fighting faiths[.]"[1] The prevailing "fighting faith" is that those who rape and murder civilians are the bad guys.  Perhaps people like the plaintiff will unseat this fighting faith.  However, to try and defend their faith, literally and Constitutionally, the defendants have the right to point at the plaintiff and say "look what she said" and "we disagree."

This lawsuit is ignoble at its core.  It seeks to stifle speech.  It is thus not a shock that a would-be censor has now filed a motion seeking to censor.  Its intent aside, Plaintiff's Motion is fatally flawed both factually and legally.

The motion is based on demonstrably false assertions about what this Court ruled, what defense counsel said publicly, and what governing law permits.  Even worse, every case that Plaintiff cites to support the request for sanctions for anything more substantial than an uncontested legal standard is either nonexistent or cites to hallucinated quotes.  If we view this with charity, it means that the brief was AI generated and Plaintiff's counsel did not check the cites.  The only other explanation is that they knowingly committed fraud upon the court about these cases.

The Motion asks this Court to impose the most severe professional penalties available—sanctions, disqualification, and a prior restraint—based not on evidence of prejudice,

---

[1] *Abrams v. United States,* 250 U.S. 616, 630 (1919)(Holmes, J., dissenting).

misrepresentation, or ethical misconduct—but on Plaintiff's counsel's own purported recollection and editorial gloss, despite the existence of a verbatim transcript of the November 19 hearing. The Motion should be denied.[2]

**ARGUMENT**

## I. PLAINTIFF MISCHARACTERIZES THE COURT'S RULING AND THE DEFENDANTS' FIRST AMENDMENT AND ANTI-SLAPP ARGUMENTS.

Plaintiff asserts that this Court "rejected" Defendants' First Amendment and Anti-SLAPP arguments and advised Defendants not to raise them again. (DE 32 at 2). The transcript[3] says otherwise. The Court actually stated: "I don't really need to hear much argument on that because, quite frankly, I don't think your motion really seriously or significantly makes that argument, and so I don't intend to rely on that argument for my ruling." (Hr'g Tr. 8:21-25).

Far from barring Defendants from raising those arguments again, the Court observed that it had not been presented with adequate briefing on those issues at that stage. Defendants' Motion to Dismiss [DE 17] advanced three independent grounds for dismissal. The Court elected to rule on two, namely deficiencies in causation and the inability to premise tortious interference liability on the dissemination of truthful, publicly available information,[4] and the Court expressly declined to reach the First Amendment and Anti-SLAPP grounds. (Hr'g Tr. 4:14-29; 17:9-18; 8:21-25).

The Court made *no ruling on the merits* of Defendants' First Amendment or Anti-SLAPP arguments. Its decision not to reach those grounds reflects restraint, not rejection. And the Court's reference to insufficient briefing implies that more comprehensive briefing on those issues could

---

[2] The Court should take action to discipline the attorneys who signed the Motion for violating their duties of candor, for engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation, for engaging in conduct that is prejudicial to the administration of justice, and for unreasonably and vexatiously multiplying the proceedings

[3] A copy of the transcript of the November 19, 2025, Motion to Dismiss Hearing is attached hereto as **Exhibit 1**.

[4] Of course, the First Amendment would not abide any tort liability for such.

warrant consideration in the future. Nevertheless, the Court grounded its ruling on the principle that tort liability cannot attach to truthful, publicly available speech. (Hr'g Tr. 18:2-13). Dismissals on that basis operate to prevent unconstitutional burdens on speech. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975); *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989). Nothing in the transcript resembles an instruction barring Defendants from raising First Amendment or Anti-SLAPP arguments in a subsequent motion. Plaintiff's assertion of this is a breach of candor, is deceitful, and is prejudicial to the administration of justice.

## II. DEFENDANTS' COUNSEL DID NOT MISCHARACTERIZE THE COURT'S RULING IN THE PRESS RELEASE.

Plaintiff contends that Defendants' counsel mischaracterized the ruling by describing it as reflecting First Amendment principles. That contention fails. Defendants were explicit about the actual basis of dismissal. The press release states that the Court: (1) recognized the Complaint was "fatally flawed on causation," and (2) made clear that "sharing truthful, publicly available information cannot give rise to a tortious interference claim under Florida law." Those statements track the Court's analysis. (Hr'g Tr. 17:20-18:24).

Defendants' counsel's further statement that such a ruling reflects core free-speech principles was truthful commentary, not a purported quotation of the Court. Courts have long recognized that prohibiting tort liability for truthful, publicly available speech enforces First Amendment protections, even when articulated through common-law doctrine. *See e.g., Cox*, 420 U.S. at 495; *Florida Star*, 491 U.S. at 541. Characterizing the ruling as a win for free speech is therefore neither false nor misleading.

//

//

### III.    FACTUAL STATEMENTS REGARDING CAIR ARE NEITHER UNETHICAL NOR DEFAMATORY.

Plaintiff argues that Defendants' counsel acted unethically by referencing governmental designations concerning CAIR. That argument fails as a matter of law. Truth is an absolute defense and the local rule permits quoting public records.  *See* LR 77.2(g). The press release referenced governmental actions taken by the State of Texas. Coincidentally, subsequent to the release's publication, the State of Florida issued a similar designation relating to CAIR.[5] The release does not accuse Plaintiff or her individual attorneys of criminal conduct or violence. Publicly identifying matters of public record relating to an opposing advocacy organization is not prohibited by any rule of professional conduct. *See Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440-41, 1445 (9th Cir. 1995) (holding that Attorneys may harshly criticize institutions and actors—even courts—so long as the statements are factually grounded or opinion-based); *The Fla. Bar v. Ray*, 797 So. 2d 556, 560 (Fla. 2001) (declining to limit "an attorney's legitimate criticism of judicial officers," so long as such criticism is not made "with reckless disregard as to their truth or falsity"). Moreover, expressions of opinion based on disclosed or publicly available facts are non-actionable. *See e.g., Lipsig v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000); *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442 (Fla. 4th DCA 2002). This is especially true where, as here, the opposing party's institutional affiliations are directly relevant to a public advocacy campaign.

//

//

---

[5] *See* State of Florida, Gov. Exec. Order. 25-244 (Recognizing that CAIR was an unindicted co-conspirator "in the largest terrorism-financing case in American history" and designating CAIR as a "terrorist organization."

## IV. PLAINTIFF FAILS TO SHOW ANY LIKELIHOOD OF PREJUDICE.

Local Rule 77.2 does not impose a gag order. It prohibits only statements that present a **reasonable** likelihood of **materially** prejudicing proceedings. Plaintiff offers no evidence—let alone clear and convincing evidence—of such prejudice. Attorney speech is protected absent a showing of substantial likelihood of material prejudice. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991). Courts reject sanctions based on speculative or hypothetical harm. *See e.g., Seattle Times Co. v. Rhinehar*t, 467 U.S. 20, 32 (1984) (recognizing continuing speech protections in civil litigation); *United States v. Brown*, 218 F. 3d 415, 425 (5th Cir. 2000) (restrictions on attorney speech require balancing First Amendment interests and concrete risks to proceedings).

This case was dismissed at the pleading stage. Although the dismissal was without prejudice, Defendants have—and continue to—consistently maintain that Plaintiff's claims are baseless and will not proceed to trial. In the off-chance the matter proceeds to trial, such trial is a long time from now and the press release could not impact the venire.

## V. THE PRESS RELEASE ADDRESSED MATTERS OF PUBLIC CONCERN.

Speech concerning antisemitism, litigation tactics, and the use of civil suits to suppress public expression lies at the core of First Amendment protection. *See NAACP v. Button*, 371 U.S. 415, 429-30 (1963) (litigation-related advocacy is protected political expression); *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (speech on matters of public concern is entitled to special protection). Such speech cannot be penalized.

The Lawfare Project is a non-profit legal advocacy organization whose mission includes defending members of the Jewish community against litigation arising from speech opposing antisemitism. At the time the press release was published, Defendants' counsel was aware of two other lawsuits filed by CAIR against members of the Jewish community for speech advocating

against antisemitism. Since the publication of the press release, Defendants' counsel has learned of two additional such lawsuits. That contextual knowledge informed the opinion expressed in the press release and underscores that the commentary addressed an ongoing, real-world pattern of litigation implicating public concern.

## VI.   STATEMENTS ON MOTIVE AND "LAWFARE" ARE PROTECTED OPINION.

Characterizing a lawsuit as abusive, retaliatory, or as an effort to weaponize tort law is classic opinion, not fact. *See Milkovich v. Lorain Journal Co*., 497 U.S. 1, 20 (1990). Courts evaluate such statements in context, including the audience, tone, and the fact that they are made by partisan participants in litigation. *See e.g., Ranbaxy Labs. Inc. v. First Databank, Inc*., No. 3:13–CV–859–J–32MCR, 2015 WL 3618429, at *3 (M.D. Fla. June 9, 2015); *Info. Control Corp. v. Genesis One Comput. Corp*., 611 F.2d 781, 784 (9th Cir.1980) (coining phrase "predicable opinion" to describe a statement unlikely to be understood by audience as a statement of fact because of the litigation position of the maker of the statement). Disagreement with that assessment does not transform opinion into sanctionable conduct.

## VII.   NO BASIS EXISTS FOR SANCTIONS OR DISQUALIFICATION.

Sanctions and disqualification are extraordinary remedies reserved for conduct that abuses the judicial process and causes actual prejudice. *Chambers v. NASCO, Inc*., 501 U.S. 32, 44-45 (1991). Plaintiff identifies no misrepresentations of the Court's ruling, no unethical falsehood, no jury taint, and no violation of professional rules. The Motion reflects disagreement with Defendants' viewpoint—not sanctionable conduct.

## VIII.   PLAINTIFF'S MOTION IS ITSELF SANCTIONABLE.

In a bit of unexpected irony, by filing the Motion, Plaintiff and her counsel engaged in sanctionable conduct. The Motion's legal argument is based primarily on fictitious cases or

quotations that are either hallucinations of generative artificial intelligence or deliberate attempts to mislead the Court. Either way, such conduct is sanctionable.

Mere weeks ago, this Court dealt with the circumstances under which sanctions may be imposed for using AI to produce inaccurate or fictitious case citations in a legal brief. *See Dubinin v. Papazian*, No. 25-CV-23877-RAR, 2025 U.S. Dist. LEXIS 229362 (S.D. Fla. Nov. 21, 2025). It noted that sanctions may be appropriate under Fed. R. Civ. P. 11, the Court's inherent authority, violation of S.D. Fla. L.R. 6(b)(2)(A), and 28 U.S.C. § 1927. *Id*. at *5-6. It noted that "Courts in this District have found that sanctions are appropriate where counsel repeatedly used artificial intelligence to cite hallucinated cases and quotations." *Id*. at *7 (citing *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 2025 U.S. Dist. LEXIS 144449, *27 (S.D. Fla. July 15, 2025) (finding that use of AI "led to repeated bad-faith misrepresentations to the Court" which justified "monetary sanctions, referral to the Florida bar, and required notification to other courts and litigants") and *Versant*, 2025 U.S. Dist. LEXIS 98418 at *14 (finding violation of Fed. R. Civ. P. 11 by "submitting a fake hallucinated case citation which allegedly supported a principle of law for which they were advocating").

The *Papazian* Court found that sanctions were appropriate against the attorney who signed a response to a motion to dismiss containing hallucinated cases and quotations because it was the signing counsel's "duty to ensure that all legal contentions are supported by existing law." *Papazian*, 2025 U.S. Dist. LEXIS 229362 at *7. The Court imposed sanctions despite the attorney claiming she was "suffering from medical issues which may have contributed to her lack of oversight and overreliance on artificial intelligence." *Id*. at *8. There is no indication that Plaintiff's counsel have such an excuse here, but even if they did, it would not help them. As a sanction for this misconduct, the Court struck the plaintiff's complaint, required the signing

attorney to pay the defendant's attorneys' fees, and referred the attorney to this Court's Grievance Committee. *Id*. at *9-10.

The following citations in Plaintiff's Motion are either hallucinated or are deliberate attempts to mislead the Court:

On page 5 of the Motion, Plaintiff quotes the following language from *Florida Bar v. Norkin*, 132 So. 3d 77 (Fla. 2013): "An attorney who impugns the integrity of the judiciary, misstates the substance of a court order, or otherwise demeans the just system engages in conduct prejudicial to the administration of justice." He purports to quote further language from the case on pages 11-12: "[m]isrepresenting the substance of a court's ruling is a serious ethical breach that demeans the justice system and warrants significant discipline." None of this language appears in *Norkin*, however, and its *actual* language does not help Plaintiff. This is a case that dealt with finding that an attorney violated Florida Rule of Professional Conduct 4-8.4(d) for "incessantly disparaging and humiliating" another attorney by sending letters, emails, and public insults disparaging and humiliating the attorney, as well as shouting at the attorney in chambers and courthouse hallways while others were present. *Id*. at 86. The conduct at issue in *Norkin* is categorically different than what Plaintiff alleges in the Frivolous Motion, and the actual holding of *Norkin* does nothing to help Plaintiff.

On page 10 of the Frivolous Motion, Plaintiff cites *Florida Bar v. Wasserman*, 675 So. 2d 103 (Fla. 1996), claiming that the Florida Supreme Court disciplined an attorney's statements that "were likely to prejudice ongoing litigation and undermine the fairness of courtroom proceedings." Again, this language does not exist in *Wasserman*. That case dealt with an attorney who was disciplined for the following conduct:

On August 23, 1993, Wasserman attended a hearing before Judge Bonnie Newton and lost his temper after a ruling by Judge Newton. He stood and shouted his

> criticism, he waved his arms, he challenged Judge Newton to hold him in contempt and displayed his arms as if to be handcuffed, he stated his "contempt" for the court, he banged on the table and generated such a display of anger that the bailiff who was present felt it necessary to call in a backup bailiff. Immediately thereafter, outside the hearing room, in the presence of both parties and opposing counsel, Wasserman stated that he would advise his client to disobey the court's ruling.
>
> …
>
> On April 14, 1994, after getting an unfavorable response to a question asked over the telephone of Judge John Lenderman through his judicial assistant, Wasserman said to the assistant, Cynthia Decker, "You little motherf-----; you and that judge, that motherf----- son of a b----." Ms. Decker was so upset by the incident that she had to leave the office early that day.

*Wasserman*, 675 So. 2d at 104. As with *Norkin*, it is astonishing bad faith to imply that the press release mentioned in the Frivolous Motion is remotely comparable to the conduct at issue in *Wasserman*.

Next up is *Florida Bar v. Ray*, 797 So. 2d 556 (Fla. 2001), which Plaintiff cites on page 10 of the Frivolous Motion, claiming that the court said "[s]tatements by an attorney that diminish the public's confidence in the integrity and neutrality of our judicial system constitute conduct prejudicial to the administration of justice." Once again, this quoted language appears nowhere in the case. Instead, the court noted that ethics rules "are designed to preserve the public confidence in the fairness and impartiality of our system of justice," such that courts may use standards other than defamation to impose discipline based on statements by attorneys. *Id*. at 558-59. There is no mention of conduct prejudicial to the administration of justice at all.

Then, and most egregiously, Plaintiff quotes at page 11 from *Florida Bar v. Schwartz*, 605 So. 2d 465 (Fla. 1992), claiming the Florida Supreme Court sanctioned a lawyer for comments that carried "ethnic and religiously charged overtones," and that such statements violated Rule 4-8.4(d) because they "create prejudice and hostility inconsistent with the standards of our profession." This entire case appears to be hallucinated. The citation provided resolves to *Dowling v. State*, 605 So. 2d 465 (Fla. Oct. 8, 1992), which has nothing to do with attorney discipline. There

are two *Florida Bar v. Schwartz* cases that address Rule 4-8.4(d), but neither one contains any of the quoted language, nor do they address anything related to ethnicity or religion. *See Fla. Bar v. Schwartz,* 334 So 3d 298 (Fla. 2022); *Fla. Bar v. Schwartz*, 382 So 3d 600 (Fla. 2024).

Finally, at page 11, Plaintiff cites *Florida Bar v. Martocci*, 791 So. 2d 1074, 2001 Fla. LEXIS 843 (Fla. Apr. 26, 2001), claiming that the court imposed sanctions on an attorney whose comments "created an atmosphere of hostility, intimidation, and disrespect that had no place in our justice system." This case exists, but the quoted language does not. The court disciplined an attorney for "making 'disrespectful and abusive comments [that] cross the line from that of zealous advocacy to unethical misconduct.'" *Id*. at *10. The conduct that the court found worthy of discipline was:

> [I]n December 1996, Martocci called Ms. Berger a "nut case." After a deposition on May 5, 1998, Martocci referred to Ms. Berger as a "crazy" and a "nut case." During another deposition on May 5, 1998, Martocci made demeaning facial gestures and stuck out his tongue at Ms. Berger and Ms. Figueroa. After a hearing on June 24, 1998, upon exiting an elevator, Martocci told Ms. Figueroa that she was a "stupid idiot" and that she should "go back to Puerto Rico." In another incident, on June 19, 1998, during an intermission of a deposition, Ms. Figueroa telephoned the office of Judge Edward J. Richardson and reached Pamela Walker, a judicial assistant. After Ms. Figueroa spoke to Ms. Walker, Martocci took the telephone and yelled the word "bitch." Martocci admitted that because the phone was dead when he received it from Ms. Figueroa, he said "son of a bitch" as a frustrated response to missing the opportunity to speak to Ms. Walker. Martocci claims that he did not say these words to anyone in particular. The referee also found that throughout the Berger proceedings Martocci repeatedly told Ms. Figueroa that she did not know the law or the rules of procedure and that she needed to go back to school.
> …
> [D]uring a recess to a hearing in the Berger proceedings, when Mr. Paton entered the courtroom, Martocci said "here comes the father of the nut case." Mr. Paton responded by approaching respondent and saying, "If you have something to say to me, say it to my face, not in front of everyone here in the courtroom." Thereafter, in open court and for all to see, Martocci closely approached Mr. Paton and threatened to beat him. Upon Ms. Figueroa's attempt to intervene, Martocci told her to "go back to Puerto Rico." This confrontation only ended when a bailiff entered the courtroom.

*Id.* at \*2-4. Predictably, Plaintiff makes no attempt to explain how this conduct is comparable to the press release mentioned in the Frivolous Motion.

The Court may have noticed a pattern in the above cases: they represent *the entirety of Plaintiff's legal argument* that Defendants' alleged conduct was sanctionable.[6] Every other case citation is provided only for basic, uncontroversial propositions of law such as that courts have inherent authority to impose sanctions, that courts need to exercise restraint in imposing sanctions, that an attorney's First Amendment rights are not unlimited, and that case-ending sanctions should rarely be imposed. Every single authority cited to explain specifically how Defendants' alleged conduct is sanctionable is either hallucinated or egregiously misrepresented. Maybe this was due to reckless use of artificial intelligence, without realizing that it is prone to hallucinations. If that is the case, Plaintiff's counsel violated Florida Rule of Professional Conduct 4-1.1, as the comment to this rule states that a lawyer should stay current on updates in the law, "including an understanding of the benefits and risks associated with the use of technology, including generative artificial intelligence . . . ." *See Papazian*, 2025 U.S. Dist. LEXIS 229362, \*6 (finding sanctions for violation of Rule 4-1.1 appropriate based on use of AI-generated citations). If the hallucinated cases and quotations were deliberate, then Plaintiff's counsel violated Rules 4-3.3(a) and 4-8.4(c) and (d), which require candor to the tribunal and forbid misrepresentations and conduct prejudicial to the administration of justice. *See In re Neusom*, No. 2:23-cv-00503-JLB-NPM, 2024 U.S. Dist. LEXIS 47595, \*11 (M.D. Fla. Jan. 12, 2024) (finding probable cause to conclude attorney violated Rules 4-3.3 and 4-8.4 for misrepresenting cited cases and fabricating authority).

---

[6] These misrepresentations regarding cited authority are in addition to Plaintiff's flagrant mischaracterizations of Defendants' counsel's press release, but the Court can see for itself that such characterizations are not consistent with the press release.

Ultimately, the explanation for how this happened does not matter. Either way, Plaintiff's counsel signed a motion containing gross misrepresentations as to the authority cited, and those misrepresentations would have been obvious to any reasonably competent attorney performing even a cursory review of the Frivolous Motion before filing it.

## IX.    CONCLUSION.

For the foregoing reasons, Defendants respectfully request that Plaintiff's Motion for Sanctions and to Disqualify Counsel be denied in its entirety.


Dated: December 12, 2025.

Respectfully Submitted,

*/s/ Marc J. Randazza*
MARC J. RANDAZZA
Florida Bar No. 625566
Email: ecf@randazza.com
RANDAZZA LEGAL GROUP, PLLC
2 S Biscayne Blvd #2600
Miami, FL 33131
Phone: (888) 887-1776

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to all counsel of record.

*/s/ Marc J. Randazza*
MARC J. RANDAZZA

# <u>Exhibit 1</u>

Hearing Transcript

November 19, 2025

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF FLORIDA |
| 2 | CASE NO. 25-CV-23202-JB |
| 3 | |
| | ZOHRA KHORASHI,                        Miami, Florida |
| 4 | |
| |        Plaintiff,              November 19, 2025 |
| 5 | |
| |   vs.                              2:30 p.m. - 2:56 p.m. |
| 6 | |
| | GADI BEER, et al.,                     Volume 1 |
| 7 | |
| |      Defendants.             Pages 1 to 20 |
| 8 | _____ |
| 9 | ZOOM MOTION TO DISMISS |
| | BEFORE THE HONORABLE JACQUELINE BECERRA |
| 10 | UNITED STATES DISTRICT JUDGE |
| 11 | APPEARANCES: |
| 12 | |
| 13 | FOR THE PLAINTIFF:        OMAR MUSTAFA SALEH, ESQ |
| |              CAIR Florida, Inc. |
| 14 |              8076 N 5th Street |
| |              Tampa, Florida 33617 |
| 15 | |
| 16 |              SYED AHMED ALI KHAN, ESQ |
| |              3696 Liberty Square |
| 17 |              Fort Myers, Florida 33908 |
| 18 | CHRISTOPHER CHARLES SHARP, ESQ |
| |              Sharp Law Firm, P.A. |
| 19 |              1600 West State Road 84 |
| |              Suite C |
| 20 |              Fort Lauderdale, Florida 33315 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
1    FOR THE DEFENDANTS:              KENNETH GEORGE TURKEL, ESQ
                                      Turkel Cuva Barrios Guerra
2                                     100 N.Tampa Street
                                      Suite 1900
3                                     Tampa, Florida 33602

4                                     JACLYN SARA CLARK, ESQ
                                      The Lawfare Project
5                                     633 Third Avenue
                                      21st Floor
6                                     New York, New York 10017

7

8

9

10

11

12

13

14

15

16

17

18

19

20   STENOGRAPHICALLY REPORTED BY:

21   VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
     Official Court Reporter to:
22   The Honorable Jacqueline Becerra
     United States District Court
23   Southern District of Florida
     400 North Miami Avenue
24   Miami, Florida 33128
     Vernita_Allen-Williams@flsd.uscourts.gov
25
```

| | |
|---|---|
| 1 | (Call to order of the Court at 2:30 p.m.) |
| 02:30PM 2 | THE COURTROOM DEPUTY:  Calling Case |
| 02:30PM 3 | No. 25-CV-23202-Becerra, Khorashi vs. Beer, et al. |
| 02:30PM 4 | Counsel, please state your appearances for the record, |
| 02:30PM 5 | starting with the plaintiff. |
| 02:30PM 6 | MR. SHARP:  Good afternoon, Your Honor.  Christopher |
| 02:30PM 7 | Sharp for the plaintiff.  I am lead counsel.  And with me today |
| 02:30PM 8 | are my cocounsel Omar Saleh and Ahmed Khan from the Council on |
| 02:30PM 9 | American Islamic Relations. |
| 02:30PM 10 | MR. SALEH:  Good afternoon, Your Honor. |
| 02:30PM 11 | MR. KHAN:  Good afternoon, Your Honor. |
| 02:30PM 12 | MR. TURKEL:  Judge, how are you?  Ken Turkel, Turkel Cuva |
| 02:31PM 13 | Barrios Guerra.  And with me is Jaclyn Clark, of the Lawfare |
| 02:31PM 14 | Project as cocounsel.  I think I'm designated lead, but don't hold |
| 02:31PM 15 | me to it.  That can be objectively verified. |
| 02:31PM 16 | MS. CLARK:  You are. |
| 02:31PM 17 | MR. TURKEL:  Yeah, okay. |
| 02:31PM 18 | THE COURT:  And you represent for the record, sir? |
| 02:31PM 19 | MR. TURKEL:  The defendant, Your Honor. |
| 02:31PM 20 | THE COURT:  All right.  So before the hearing started, I |
| 02:31PM 21 | heard commentary from counsel that they were surprised having a |
| 02:31PM 22 | hearing in federal court.  I have oral argument on all my motions |
| 02:31PM 23 | to dismiss and all motions for summary judgment.  Pretty much any |
| 02:31PM 24 | motion that's not routine and/or is opposed gets a hearing in |
| 02:31PM 25 | front of me. |

4

02:31PM  1        So what you don't get is a Zoom hearing.  Typically it's

02:31PM  2    an in-person hearing.  We're only doing this by Zoom today because

02:31PM  3    I have a criminal matter where depositions, interestingly enough,

02:32PM  4    had to be taken, and the parties are using my courtroom to do so.

02:32PM  5        And so if we are, for whatever reason, are back on

02:32PM  6    another motion in this case or you have any other matter before

02:32PM  7    me, expect to come to court.

02:32PM  8        All right.  I'm here on the defendant's motion to

02:32PM  9    dismiss.  Let's proceed to argument, please.

02:32PM  10       MS. CLARK:  Thank you, Your Honor.

02:32PM  11       We appreciate the opportunity to present oral argument on

02:32PM  12   defendant's motion.  Our position here is straightforward.

02:32PM  13       Even taking every allegation in plaintiff's complaint as

02:32PM  14   true, she has not pled a viable cause of action under Florida law.

02:32PM  15   Our position rests on three independent grounds; each of which is

02:32PM  16   fatal to plaintiff's claim.

02:32PM  17       One, the only alleged conduct by defendants is the

02:32PM  18   publication of truthful publicly available information which

02:32PM  19   cannot, as a matter of law, constitute unjustified interference.

02:32PM  20       Two, the complaint itself affirmatively negates causation

02:33PM  21   and shows that plaintiff's former employer terminated her based on

02:33PM  22   its own independent judgment about her social media posts, not

02:33PM  23   anything defendants did.

02:33PM  24       And three, the complaint targets protected speech on a

02:33PM  25   matter of public concern; and therefore triggers Florida's

02:33PM 1   Anti-SLAPP protections and the First Amendment.

02:33PM 2          Turning to our first point, Your Honor, I want to first

02:33PM 3   begin with outlining what this case is and what it is not.

02:33PM 4          This is not a case about false or defamatory statements.

02:33PM 5   It is not a case about confidential data or insider information or

02:33PM 6   coercive contact with an employer.  None of that is alleged.

02:33PM 7          What is alleged is simply that defendants posted a

02:33PM 8   hyperlink, nothing more, to plaintiff's already public law firm

02:33PM 9   profile.  That is the only alleged conduct by defendants that

02:33PM 10  plaintiff's entire tortious interference claim rests on; a comment

02:34PM 11  on a trending Instagram post about plaintiff's controversial

02:34PM 12  social media content, linking to plaintiff's law firm profile.

02:34PM 13         Florida law is absolutely clear that you cannot base a

02:34PM 14  tortious interference claim on the dissemination of truthful

02:34PM 15  publicly available information like defendants are alleged to have

02:34PM 16  done here.  This is binding legal precedent.

02:34PM 17         The Eleventh Circuit's decision -- the Eleventh Circuit's

02:34PM 18  1994 decision in Worldwide Primates vs. McGreal is especially

02:34PM 19  instructive here.  In that case the defendant actually contacted a

02:34PM 20  party to the business relationship directly.  They sent letters

02:34PM 21  criticizing the plaintiff, attached damaging government reports,

02:34PM 22  and plainly hoped that the parties to the business relationship

02:34PM 23  who was receiving the letters would sever ties with the plaintiff

02:34PM 24  as a result.

02:34PM 25         Yet the court still held that there was no interference

1   as a matter of law because the defendant conveyed only truthful

2   publicly available information.

3        In doing so, the court emphasized that providing truthful

4   information, even if unsolicited, even if critical, even if

5   intended to influence a third-party's decision, is categorically

6   justified and cannot constitute tortious interference as a matter

7   of law.

8        If the far more direct conduct in Worldwide Primates is

9   legally insufficient, then plaintiff's theory here necessarily

10  fails.  Notably, in Worldwide Primates the court also found that

11  the record supported the imposition of Rule 11 sanctions against

12  plaintiff for advancing a plainly frivolous claim.

13       Here the allegations of the complaint make clear on her

14  social media account plaintiff used her real name.  She used her

15  law firm headshot.  She identified herself as a lawyer.  She

16  regularly posted controversial contact by a hot button

17  geopolitical conflict, and she acknowledges that anyone could

18  identify her workplace with minimal effort.

19       So even taking all allegations in the complaint as true,

20  the information the defendants allegedly disclosed was nothing

21  more than a link to what plaintiff herself had already chosen to

22  make publicly available.

23       Florida courts are clear; such conduct cannot give rise

24  to a tortious interference claim as a matter of law.  Not only do

25  the cases cited by plaintiff in her response not hold otherwise,

02:36PM 1   but they also actually undermine her theory.

02:36PM 2       Plaintiff relies heavily on Salit, but Salit involved

02:36PM 3   knowingly false statements made within a corporate structure as

02:36PM 4   part of an alleged scheme to oust someone from a position.  That

02:36PM 5   case emphasizes falsity, not truth.

02:36PM 6       She cites Ethyl, claiming it supports her claims.  But

02:36PM 7   Ethyl actually reversed a judgment because causation was too

02:36PM 8   speculative.  That case helps defendants, not plaintiff.

02:37PM 9       She cites Drewes, but that was a case about fiduciary

02:37PM 10  duties and exploitation of insider access, including the targeting

02:37PM 11  of vulnerable clients.  It is not even remotely similar to the

02:37PM 12  fact of this case.

02:37PM 13      Each case that plaintiff relies on involves something

02:37PM 14  that defendants did not do.  Misrepresentations, falsity,

02:37PM 15  coercion, insider information, here there is none of that.  The

02:37PM 16  complaint should be dismissed for this reason alone.

02:37PM 17      Turning to my second point, Your Honor, even if plaintiff

02:37PM 18  could somehow convert truthful public speech into unjustified

02:37PM 19  interference, which she can't, her complaint independently fails

02:37PM 20  on the element of causation.  Here plaintiff's own allegations

02:37PM 21  negate causation as a matter of law.

02:37PM 22      She admits Chartwell already knew about her social media

02:37PM 23  posts.  She admits that Chartwell terminated her because, quote,

02:37PM 24  "her social media activities did not align with the firm's values

02:38PM 25  and beliefs," end quote.

02:38PM 1    She admits Chartwell received a flood of communications

02:38PM 2    after stopantisemitism.org posted about her; not after anything

02:38PM 3    defendants did.  She does not allege that defendants contacted her

02:38PM 4    employer.  She does not allege that defendants asked anyone to

02:38PM 5    call the employer.  She does not allege the defendants made a

02:38PM 6    statement about her to her employer.  And she has not alleged that

02:38PM 7    her employer saw defendants' posts, let alone relied on them.

02:38PM 8    This is fatal and warrants dismissal.

02:38PM 9    Chartwell's independent judgment is front and center in

02:38PM 10   the complaint.  Even taking all of plaintiff's allegations as

02:38PM 11   true, defendants are not the reason the plaintiff was fired.

02:38PM 12   Plaintiff was fired because of her own posts on social media and

02:38PM 13   because of Chartwell's independent decision that those posts

02:38PM 14   didn't align with the firm's values.  Dismissal is warranted for

02:38PM 15   this reason as well.

02:38PM 16   Your Honor, this leads me to my third point.  The lawsuit

02:39PM 17   in this case targets protected speech on a matter of public

02:39PM 18   concern, and that means that it is barred both by the First

02:39PM 19   Amendment and by Florida's Anti-SLAPP statute.

02:39PM 20   THE COURT:  I don't really need to hear much argument on

02:39PM 21   that because, quite frankly, I don't think your motion really

02:39PM 22   seriously or significantly makes that argument, and so I don't

02:39PM 23   intend to rely on that argument for my ruling.

02:39PM 24   Let me ask you just one thing about causation.  The

02:39PM 25   complaint alleged that the law firm didn't know about the posts,

02:39PM   1   and they found out about the posts through your client's behavior.

02:39PM   2          Wouldn't that be a different argument with respect to

02:39PM   3   causation?

02:39PM   4          MS. CLARK:  No, Your Honor, because the law firm would

02:39PM   5   still be making an independent decision as to whether or not they

02:40PM   6   wanted to terminate the plaintiff.

02:40PM   7          In Worldwide Primates there was direct contact with the

02:40PM   8   party to the business relationship, and the court held that even

02:40PM   9   with direct contact, even if you're contacting the party to the

02:40PM   10  dismissed relationship with the intent to sever that relationship,

02:40PM   11  it is still not enough, unless you prove that the relationship was

02:40PM   12  actually severed because of your conduct.

02:40PM   13         And here, no matter if they found out about the posts

02:40PM   14  from the defendants -- which they didn't, and the complaint admits

02:40PM   15  that -- the law firm alone has the authority to terminate

02:40PM   16  plaintiff.  Defendants have no sort of authority to make that

02:40PM   17  decision for them.

02:40PM   18         THE COURT:  Let me hear the response.

02:40PM   19         MR. SHARP:  Thank you, Judge.

02:40PM   20         And in this case the main elements that are contested on

02:41PM   21  the claim are elements three and four, but I want to talk about

02:41PM   22  briefly about elements one and two because it really puts this

02:41PM   23  case in context.

02:41PM   24         The first and second elements are the existence of

02:41PM   25  employment relationship and the defendants' awareness of that.

02:41PM 1            Now, in defense counsel's argument she focused on the

02:41PM 2     events on February 18, 2024, when my client's publicly accessible

02:41PM 3     information was posted on the Jew Hate DB website.  Let's talk

02:41PM 4     about prior to that because these people knew each other before.

02:41PM 5            Mr. Gadi Beer was the CFO of the Chartwell Law Firm until

02:41PM 6     early 2023 when he left, so he knew very well that my client

02:41PM 7     worked there.  He probably had information about her salary, I

02:41PM 8     don't know.  But he was the CFO.  He knew who she was.

02:41PM 9            Beth Gellman Beer had started posting on my client's

02:41PM 10    social media, we allege this in the complaint, in October 2023.

02:41PM 11    As soon as my client began posting her concerns about people

02:41PM 12    getting killed in Gaza, Beth Gellman Beer popped up under an

02:42PM 13    assumed name, Beth Margo.  At this time Ms. Gellman Beer is an

02:42PM 14    attorney in the Department of Education civil rights division with

02:42PM 15    the Biden administration.

02:42PM 16           For two or three months she posted the most vile comments

02:42PM 17    on my client's social media.  We have summarized them in the

02:42PM 18    complaint.  But she said things like my client's not fit to be a

02:42PM 19    mother, she shouldn't be an attorney, all sorts of stuff.  My

02:42PM 20    client tried to engage with her and defuse it; it didn't work out.

02:42PM 21    She eventually blocked her from her site.

02:42PM 22           After Ms. Gellman Beer was blocked from the site is when

02:42PM 23    the doxxing -- or when the Jew Hate DB website comes into play.

02:42PM 24    And so here you have a website.  And if you go to the website --

02:42PM 25    we have alleged this in the complaint -- this is not a place to

02:42PM  1   have a reasoned discourse about current events.  It's a hate site.

02:42PM  2   You go there and you put somebody's name in, they post them up.

02:42PM  3   If they don't know the name:  Hey, does anybody know this person

02:42PM  4   because we want to harm them?  The sole purpose for the existence

02:43PM  5   of this website is to harm people who these people decide must be

02:43PM  6   anti-semites.  So they act as judge, jury, and executioner on

02:43PM  7   these websites.  Again, with no possible proper purpose here.

02:43PM  8         So on this website my client's posts appear.  They're

02:43PM  9   doctored a little bit to make some kind of a point that she must

02:43PM  10  be an anti-semite, which she's not obviously.  And within the same

02:43PM  11  day it's posted, Ms. Gellman Beer and her husband both pop up in

02:43PM  12  the comment session.  Did they just happen to be wandering the

02:43PM  13  Internet that day and go in there?  I doubt it, but they appear.

02:43PM  14        And just as anticipated, when her picture and her -- or

02:43PM  15  when her post is put on that website, people start asking because

02:43PM  16  that's the purpose of the website:  Where does she work?  We're

02:43PM  17  going to go get her fired because you've a rogues' gallery here of

02:43PM  18  people you have had fired, this is what we want to do.  Where does

02:43PM  19  she work?  And Ms. Gellman Beer and her husband happen to just be

02:43PM  20  there and provide the link to the website.

02:44PM  21        Now, granted it may have been publicly available, but

02:44PM  22  none of the other people on that website went out and found it.

02:44PM  23  They did it and they knew it.  They knew she worked there.

02:44PM  24        My client does not post any information about her --

02:44PM  25  where she works on her private website.  She says she's a lawyer.

02:44PM   1   She does not say where she works.  Uses the same picture that's in

02:44PM   2   her law firm profile.  But again, nobody would have known where

02:44PM   3   she worked except the Beers because they knew it.  So they --

02:44PM   4          THE COURT:  Well, I'll just take a short issue with that.

02:44PM   5          If you're a lawyer, it is pretty easy.  You go to the

02:44PM   6   Florida Bar website, and you know exactly where she works.  Forget

02:44PM   7   about Googling.

02:44PM   8          MR. SHARP:  Oh, sure, absolutely.

02:44PM   9          But the reason why this is tortious interference is

02:44PM   10  because the defendants appear on a website that's designed to harm

02:44PM   11  people, get them fired.  A mob has formed saying:  We want to go

02:44PM   12  get this person.  Where does she work?  They give the address.

02:45PM   13         And again, it could have been somebody else.  Maybe those

02:45PM   14  people would have found her on their own, but they didn't.  The

02:45PM   15  Beers provided it to them.

02:45PM   16         And then Beth Beer -- Beth Gellman Beer chimed into the

02:45PM   17  comment:  Oh, they think that law firm's Jewish clients would want

02:45PM   18  to know that this kind of person works there.  Again, encouraging

02:45PM   19  what they knew was very likely to happen on this website because

02:45PM   20  that's what it exists for.  So in some sense, Judge --

02:45PM   21         THE COURT:  But the problem is that the activity or the

02:45PM   22  action doesn't take place by that website; it takes place by the

02:45PM   23  law firm.

02:45PM   24         The law firm gets this information and could certainly

02:45PM   25  have concluded that it's speech that is in line with their values

02:45PM  1    or speech that they otherwise have no issue with or speech that

02:45PM  2    they allow or anything else.

02:45PM  3          I mean, at the end of the day, her damage comes from the

02:45PM  4    firm's decision to fire her over speech.

02:46PM  5          MR. SHARP:  Well, and Your Honor, if I could speak to

02:46PM  6    that point.

02:46PM  7          The complaint does not allege that she was fired solely

02:46PM  8    for the content of her social media posts.  And in fact, to

02:46PM  9    correct Your Honor, the firm was already aware of all of her

02:46PM  10   social media posts.

02:46PM  11         THE COURT:  Right.  So that's really the issue on the

02:46PM  12   causation --

02:46PM  13         MR. TURKEL:  But they were aware.

02:46PM  14         THE COURT:  Excuse me, sir.

02:46PM  15         So they were aware of it.  And so this conduct that the

02:46PM  16   defendants were involved in might have -- accepting all those

02:46PM  17   allegations as true, how can it be -- how can it cause, right, the

02:46PM  18   interference with the law firm, when the law firm not only knew of

02:46PM  19   the comments?

02:46PM  20         Actually, what you allege is that the law firm ended up

02:46PM  21   acting upon totally different comments that the Beers have nothing

02:46PM  22   to do with.

02:46PM  23         MR. SHARP:  There, Judge, that's not entirely correct.

02:46PM  24   And I apologize if that's the impression you got from the

02:46PM  25   complaint.

02:46PM  1        But I think what we alleged -- and we got this from the

02:47PM  2   law firm's EEOC statements, they said that she was fired for the

02:47PM  3   fact that the controversy that was caused by the second doxxing

02:47PM  4   (unintelligible) anti-semitism website.

02:47PM  5        And in fact to answer Your Honor's question, they had met

02:47PM  6   with my client before and told her:  We're monitoring your social

02:47PM  7   media.  We're looking at everything.  And they didn't ask her to

02:47PM  8   take anything down.  They kind of in hindsight:  Oh, we have a

02:47PM  9   problem with some of these posts.

02:47PM  10       But the reason they fired her is because they said this

02:47PM  11  public doxxing that was precipitated by the Beers giving contact

02:47PM  12  information caused such a controversy.  They had phone calls.

02:47PM  13  They claimed their employees were threatened by people from the

02:47PM  14  Internet.

02:47PM  15       So it wasn't the social media posts; it was the

02:47PM  16  controversy that resulted from the way the social media posts were

02:47PM  17  manipulated, taken out of context, and presented through two

02:48PM  18  different hate sites; well-known hate sites where people are

02:48PM  19  doxxed and people's careers are ruined. So it's --

02:48PM  20       THE COURT:  Are the Beers involved in the two different

02:48PM  21  sites?  Because I thought that the Twitter site had nothing to do

02:48PM  22  with them.

02:48PM  23       MR. SHARP:  No, they are -- they are actually related

02:48PM  24  sites, and I think we have alleged this, Judge.

02:48PM  25       If you go to the StopAntisemitism website --

02:48PM  1          THE COURT:  No, no, I don't need to go to any website.

02:48PM  2          (Crosstalk.)

02:48PM  3          MR. SHARP:  We've alleged this in the lawsuit, Judge.

02:48PM  4          THE COURT:  Show me.

02:48PM  5          MR. SHARP:  On the front page of the Jew Hate DB website

02:48PM  6   it says:  We are a project of StopAntisemitism.  They are

02:48PM  7   absolutely related.  They're related websites.  And it is not

02:48PM  8   uncommon for someone to be doxxed on the Jew Hate DB website,

02:48PM  9   which is a smaller audience, and then later on the larger exposure

02:48PM  10  on the StopAntisemitism.

02:48PM  11         So this is something that was foreseeable; and that if

02:48PM  12  the Beers are posting on a well-known website that doxxes people,

02:49PM  13  this is what they intended.  It's sort of a two-part process, but

02:49PM  14  that's the way these two websites work hand in hand.  And so

02:49PM  15  again, putting the name out on the Jew Hate DB directly leads to

02:49PM  16  the second doxxing.  Nobody else put the name out.

02:49PM  17         And then the second doxxing, again, it's not the social

02:49PM  18  media posts, it's the controversy created by them, and that was

02:49PM  19  started by the Beers.  I mean the Beers gave the mob with the

02:49PM  20  pitchforks the address to go to to harass that employer and try to

02:49PM  21  talk them into getting rid of her.  And we know how that works.  I

02:49PM  22  mean we've seen this on social media.  Everyone says terrible

02:49PM  23  things, the employer feels the pressure, negative publicity.

02:49PM  24         But that was why she was fired, and that wasn't an

02:49PM  25  independent decision of the law firm.

02:49PM  1       THE COURT:  So she's fired because the law firm made the

02:49PM  2   determination that someone with this kind of social media platform

02:49PM  3   or statements created a situation that was bad for business.  I'm

02:50PM  4   not saying that was a good decision by the law firm or the right

02:50PM  5   decision by the law firm.  That's not before me.

02:50PM  6       I'm still having difficulty as you have pled this

02:50PM  7   complaint linking up the activity of the Beers with her actual

02:50PM  8   damages, which was her eventual termination, which was a decision

02:50PM  9   that the law firm made based in its best interests.

02:50PM  10      MR. SHARP:  And I think we've alleged, Judge, but for the

02:50PM  11  doxxing, they wouldn't have terminated her because, again, all of

02:50PM  12  her social media posts had been reviewed by the law firm.

02:50PM  13      And I can plead more facts here if that's what we need to

02:50PM  14  do to connect it and make it clearer that the law firm had every

02:50PM  15  opportunity to fire her for the content of her social media posts

02:50PM  16  for months, and they didn't.  They met with her --

02:50PM  17      THE COURT:  What your complaint says is that her social

02:50PM  18  media content, which precipitated the doxxing, did not align with

02:51PM  19  the firm's values.  That's how you pled it.

02:51PM  20      MR. SHARP:  And that's quoting from the EEOC position

02:51PM  21  statement, and I have an "and" there; "and" the way it fell into

02:51PM  22  the law firm's lap for the docket.  So, Your Honor, I can

02:51PM  23  certainly replead it and make it more clear, but the position

02:51PM  24  statement of the EEOC was clear that it was the doxxing that

02:51PM  25  precipitated it.

02:51PM  1          Again, all the social media posts were known to the firm.
02:51PM  2  They had spoken to her about them.  They didn't ask her to take
02:51PM  3  down a single post.  And then the doxxing happens, and all the
02:51PM  4  posts that they had told her were okay suddenly are a problem
02:51PM  5  because employees are getting threatened.  They claim that people
02:51PM  6  felt unsafe working around her now.  They worked around her for
02:51PM  7  months; same posts.
02:51PM  8          So again, if the pleading is not clear on that, I can
02:51PM  9  certainly address it because --
02:51PM 10          THE COURT:  I am going to dismiss the complaint without
02:51PM 11  prejudice.  I do think you have to clarify that because I'm just
02:51PM 12  looking at paragraphs in the complaint, and that's not what the
02:52PM 13  complaint says.
02:52PM 14          I understand that that's your argument today, and I
02:52PM 15  understand that's the reading that you have.  Obviously, you know
02:52PM 16  the facts.  But I'm looking at the four corners of the complaint,
02:52PM 17  which is all I can look at.   I can't go to those websites.
02:52PM 18          MR. SHARP:  Sure, Judge.
02:52PM 19          THE COURT:  I can't do that.
02:52PM 20          So I think that there are a couple of deficiencies that
02:52PM 21  have to be addressed.  And so one of the deficiencies that have to
02:52PM 22  be addressed -- and again, this is part of the argument that they
02:52PM 23  raise -- that the truthful information can't constitute tortious
02:52PM 24  interference.
02:52PM 25          You respond that it can if it's done with malice or a

02:52PM  1    legitimate purpose.  I just note for the record that the cases you

02:52PM  2    cite don't hold that.  And so I don't know if this is just an

02:52PM  3    issue that tortious interference perhaps is not the cause of

02:52PM  4    action that fits the facts you're alleging.  But on that, I think

02:52PM  5    if you look at Westlake Financial or Worldwide Primates, which

02:53PM  6    were cited by the defense, I think there is an issue there.

02:53PM  7            I think the causation is also a significant issue because

02:53PM  8    at the end of the day, it is the firm that takes that position,

02:53PM  9    that fires them for speech that, by the way, wasn't personal.  So

02:53PM  10   it's not, for example, you have a doxxing case where somebody's

02:53PM  11   address, right, which is not otherwise publicly available is

02:53PM  12   provided or some statement that somebody made in a private

02:53PM  13   setting, right, a recording, something like that, and it's put out

02:53PM  14   there that's not public information.

02:53PM  15           This has public information.  This is public.  It was

02:53PM  16   clearly public.  I mean you have conceded that the law firm even

02:53PM  17   knew of it.  And so I think you're going to have to amend this

02:53PM  18   complaint.  Either amend the tortious interference allegations --

02:54PM  19   I don't know how you're going to amend it.  You may decide to do

02:54PM  20   something else with it, I don't know.  I can't tell you how to

02:54PM  21   amend it necessarily or whether or not you want to do something

02:54PM  22   different with it.

02:54PM  23           But I can tell you as pled, it is insufficient and I am

02:54PM  24   granting the motion without prejudice --

02:54PM  25           MR. SHARP:  Your Honor --

02:54PM  1          THE COURT:  Excuse me, sir.  You can't speak over me.  I

02:54PM  2  can't get a record that way; especially on Zoom.

02:54PM  3          So I'm granting the motion without prejudice so that you

02:54PM  4  can amend the complaint.  How many days do you need to amend, sir?

02:54PM  5          MR. SHARP:  With the holidays coming up, Judge, I would

02:54PM  6  ask for 20.

02:54PM  7          THE COURT:  I have no problem with at that.  We'll give

02:54PM  8  you 20 days to amend the complaint.

02:54PM  9          MR. SHARP:  And, Judge, if I could just ask a quick

02:54PM  10  question.

02:54PM  11          I know we have essentially alleged in here that it's

02:54PM  12  but-for causation.  We didn't obviously -- obviously, there can be

02:54PM  13  more than one but-for cause of an event.  Based on what the law

02:54PM  14  firm said, and I will represent this is what they said, it was

02:54PM  15  because of the controversy resulting from.  So even if it was in

02:54PM  16  part because of the posts, if they say that the straw that broke

02:55PM  17  the camel's back here was the fact there was a public doxxing and

02:55PM  18  we got all this fallout at the law firm --

02:55PM  19          THE COURT:  Maybe that's what you should allege next time

02:55PM  20  because sometimes when you know a case well, I think you should

02:55PM  21  look specifically at how this was pled and replead it and then

02:55PM  22  we'll see after you replead it whether there is another motion or

02:55PM  23  not.

02:55PM  24          If there is another motion, just to let you all know,

02:55PM  25  like I said, it will be in person.  I don't want anybody to get

02:55PM    1    confused and say:  Oh, we thought this would be by Zoom.  This is

02:55PM    2    just a unique issue that I have with my courtroom today.  So if

02:55PM    3    there should be another motion, I will have oral argument on it.

02:55PM    4    If there is not another motion and there is an answer and the case

02:55PM    5    proceeds, I'll have argument on anything that's dispositive of the

02:55PM    6    case.

02:55PM    7            MR. SHARP:  Thank you, Judge.

02:55PM    8            THE COURT:  All right.  Thank you very much, and have a

02:55PM    9    great Thanksgiving.

02:55PM   10            MR. TURKEL:  Thank you.

02:56PM   11            MS. CLARK:  Thank you.

02:56PM   12            MR. TURKEL:  You too, Your Honor.

02:56PM   13            (Proceedings recessed at 2:56 p.m.)

  14                   C E R T I F I C A T E

  15      I hereby certify that the foregoing is an accurate

  16    transcription of the proceedings in the above-entitled matter.

  17      This hearing occurred via Zoom and is therefore subject

  18    to the technological limitations of reporting remotely.

  19

  20    DATE:  11/26/25          /s/Vernita Allen-Williams
                                VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR

  21                              Official Court Reporter
                                United States District Court

  22                              Southern District of Florida
                                400 North Miami Avenue

  23                              Miami, Florida 33132
                                305.523.5938

  24

  25